No. 14,617.

COATES *v*. THE PEOPLE.
(106 P. [2d] 354)

Decided July 1, 1940.   Rehearing denied November 25, 1940.

Mr. MAX D. MELVILLE, Mr. FRED M. WINNER, for plaintiff in error.

Mr. Byron G. Rogers, Attorney General, Mr. Reid Williams, Assistant, Mr. John A. Carroll, Mr. William E. Doyle, for the people.

*En Banc.*

Mr. Justice Bakke delivered the opinion of the court.

Plaintiff in error, defendant below, was convicted of murder in the first degree and sentenced to death for the killing, on the night of October 13, 1938, of one Fred Renovato, a member of the Denver police force. Reversal is sought on a writ of error. Reference will be made to plaintiff in error as the defendant, or Coates.

The following is a statement of the facts, which we think finds support in the evidence, and which the jury were entitled to believe.

"Coates had cohabited with one Virginia Garcia at intervals for some years. The witness Garcia states that she was a prostitute, that Coates had tried to get her to be his woman and to 'hustle' for him, and that she had shared her earnings at various times with him. She further stated that during the three months previous to October 13th she had left Coates and was living with one Sam Williams at 2047 Market street, a rooming house. Coates was displeased with this arrangement. On October 13th, in the late afternoon or early evening, he was seen standing around outside the Market street address. Later that evening he accosted Garcia as she came outside, and forced her to return to his room at 2224 Larimer street. After arriving there, they drank some wine, and at approximately 7:30 p.m. they went to bed and to sleep. At 9:30 p.m. Garcia woke up and stole out of the house while Coates was asleep. She boarded a taxicab on Larimer street and returned to the room of Sam Williams. Shortly thereafter Coates awakened and, finding Garcia gone, he placed a revolver and some extra shells in his pocket and went immedi-

ately to 2047 Market street for the purpose of bringing her back. He entered Sam Williams' room and found Garcia on the bed. He pulled her off the bed, and started pulling her out of the house and into the alley. Meanwhile Sam Williams, who had been in the room, sought out Grant McIver, his landlord, and the two men proceeded to the back of the building, arriving there just as Coates and Garcia approached the alley. A distance of about twenty feet separated them. When McIver turned a flashlight on Coates, the latter placed Garcia in front of him and, pointing his gun at McIver and Williams, told them to go on about their business. McIver asked Williams to 'go call the police.' He said this in such a manner that Coates could hear it. While Williams went in search of the police, McIver, with the same idea, drove with one Bert Hedspeth in the latter's automobile to the corner of 21st and Larimer streets, where he found detective Fred Renovato. McIver asked Renovato 'if he would go down and help me get the lady from the man that was dragging her through the alley, Virginia Garcia and Mr. Coates; told him that he was armed.' 'He went in the car with me.'

"Coates, meanwhile had dragged Garcia to 22nd street by way of alleys. He had proceeded south on 22nd street to Larimer street, had crossed to the east side of Larimer, and was walking toward the alley between Larimer and Lawrence on 22nd street. McIver and Renovato in Renovato's car drove south on 22nd street, overtook Coates and Garcia, and thereafter cut across to the wrong side of the street, stopping the car at a position some ten feet ahead of Coates and Garcia. Renovato stepped out of the car and said, 'Hey, stop here. What are you doing?' At this moment Coates began to fire. As Renovato started to go down, the second shot entered his back before his body sank to the pavement. Two or three more shots were fired. Renovato fired a few shots from his own pistol after he had fallen down. * * *.

"Afterwards he [Coates] pointed the gun at Garcia and pulled the trigger several times, causing a clicking sound. Coates then left the scene of the shooting and proceeded toward 23rd street in the alley between Larimer and Lawrence. According to the statement Coates made to the captain of detectives after his arrest, he continued on toward the railroad tracks. He reloaded his gun and proceeded out north of the city. * * *."

Coates was apprehended a few days later in the railroad yards at La Salle, Colorado, and brought back to Denver and confined in jail until the trial. He admits owning the gun used, and that he fired the fatal shots.

While a plea of self defense was presented on the trial, it is not seriously urged on review. Grounds of reversal all center about the conduct of the trial.

Coates' counsel summarize their assignments of error as follows:

"1. The defendant was charged with homicide. The court erroneously permitted evidence of wholly unrelated, separate and distinct crimes which unduly prejudiced the defendant in the eyes of the jury.

"2. Evidence of threats made by the defendant against third persons, in no way connected with the deceased, long prior to the killing, had no place in the trial, and was highly prejudicial.

"3. The prosecution was improperly allowed to cross-examine its own witness, Garcia, and thus place before the jury inadmissible, irrelevant, hearsay statements made by her to the police, which were highly prejudicial to the defendant. This cross-examination was improper on two grounds:

"(a) As appears from the record, the prosecution's claim of surprise cannot have been made in good faith, because her testimony in nowise contradicted her statement made to the police.

"(b) Before cross-examination on the ground of surprise can be allowed, the witness must have given af-

firmative, hurtful testimony, and no such testimony was given.

"4. Although the witnesses Lopez and Williams had not been impeached, the prosecution was allowed to corroborate and bolster their testimony. In the case of the witness Lopez, this resulted in permitting the jury to consider evidence given to the police department, not under oath, out of the presence of the defendant, and not subject to cross-examination.

"5. The jury was misinformed as to the right of a police officer to arrest without a warrant, and the court refused to give an instruction tendered by the defendant which correctly stated the law in this respect.

"6. Rogue's Gallery pictures of the defendant were not admissible in evidence, no question of identity having been raised, and, even if there were justification for the introduction of such pictures, different sets of the same pictures could not be introduced on both the prosecution's direct and rebuttal case to emphasize the fact that defendant was a police character.

"7. The entire atmosphere of the case was distinctly and horribly unfair. Any and all devices to secure a conviction were used by the prosecution and the defendant did not have a fair trial."

■■ 1 and 2. The so-called evidence of other crimes, which it is contended was inadmissible, involved an attempt to establish the following offenses committed by defendants: (a) That Coates was a pimp within the meaning of section 211, chapter 48, '35 C.S.A., C.L. §6845; (b) that an assault was made upon witness Garcia; (c) that an assault was made upon Sam Williams.

(a) It is contended that Virginia Garcia's hustling for Coates subjected him to liability of prosecution under section 211, supra, a point we do not decide, because whether it did or not we think evidence concerning it was admissible to show a motive for the crime charged. It cannot be disputed that Coates considered her an eco-

nomic asset and that he would endeavor to frustrate any attempt to take her away from him. This sufficiently appears from defendant's own testimony on direct examination when in response to the question, "There has been some testimony, Joe, that you used Virginia Garcia as a prostitute and collected money from her; is that true?, he answered, "Sure yes, years ago, about—sure, I have done that." The evidence justified the conclusion that the same relationship continued up to the very time of the homicide, and that she had been "hustling" for him right along. A reasonable inference from the testimony in this case was that defendant shot Renovato because he thought the officer was attempting to take his "woman" away from him, and according to witness McIver that was what he and Renovato were about to do when the fatal shots were fired. Consequently, we are of the opinion that this testimony comes within the exception to the rule excluding evidence of other crimes, announced in *Jaynes v. People,* 44 Colo. 535, 543, 99 Pac. 325, the exception being that evidence of another offense, which tends to prove some element of the one for which the accused is being tried, is admissible.

(b and c) The evidence of the alleged assaults is admissible as a part of the res gestae. The testimony challenged is summarized as follows: "Witness Garcia: 'Three hours before the killing the defendant grabbed her and forced her down the alley, and slapped her. Three hours before the killing he grabbed her, slapped her and cursed her. He knocked her down with a gun. Many times prior to the killing he threatened to kill her.' Witness Williams: 'Coates hit her with a gun and grabbed Garcia and pulled her to floor.' Witness Garcia: 'Coates threatened Sam Williams on October 13 or shortly prior thereto.' " Where, as here, the elements of conduct involved in the previous assaults continued down to the very evening of the scene, of which the fatal shooting was the culmination, such evidence concerning them was harmless, and merged with that concerning

assaults and threats which were admissible as part of the res gestae.

A fair analysis of the evening's events readily discloses that the threat to Sam Williams: "I says, Sam, I don't want to hurt you about Virginia, I says, but you let Virginia alone," which defendant admits making, and the assault upon Garcia, together with the fatal shooting, all took place during the evening of October 13, and they constitute an inseverable chain of circumstances, "while the nervous excitement still dominates the reflective power." *Lambrecht v. Schreyer,* 129 Minn. 271, 152 N.W. 645. We think the evidence in this case clearly discloses that the state of mind acquired by defendant in the early part of the evening persisted up to and including the time of the fatal. shooting, and we are of the opinion that the statements made by defendant during this time were a part of the res gestae. 20 Am. Jur. 553, 10 R.C.L. 982. A strikingly similar situation existed in the case of *Garcia v. People,* 59 Colo. 434, 439, 149 Pac. 614, in which we said that "The testimony, concerning the transaction at the time, and what was done by the defendant, was relevant as bearing upon the cause for the shooting of the officer; it was properly admitted as a part of the res gestae."

3. Concerning the alleged impropriety of permitting cross-examination of the people's witness Garcia by the district attorney, it clearly appears that the element of "surprise" was sufficiently present to justify the cross-examination regarding her statement to the police.

Surprise, in this connection, is one of those sudden mental reactions which are frequently not susceptible of analysis away from the conduct of the one causing the surprise, and since its presence must be determined by the trial court in the reasonable exercise of its discretion, its holding will not be disturbed unless abuse of that discretion is shown. No ironclad rule defining circumstances under which "surprise" can be successfully

asserted can be laid down. The attempt to do so in any given case must be construed in the light of the facts of that case. This is well illustrated in *Babcock v. People*, 13 Colo. 515, 22 Pac. 817, in which we stated, "where it appears that a witness is giving testimony contrary to the reasonable expectation of the party calling him, such party should be allowed to cross-examine such witness for the purpose of refreshing his recollection." Garcia's testimony on direct and cross-examination discloses no material discrepancy. Her attitude was more than a failure to remember. Her silence was clearly hostile. Faced with her former statement, her memory became strangely active and she proceeded to reaffirm that statement in every material detail. She was not impeached. The cross-examination simply demonstrated the hostility of her silence and was amply justified under the rule of "surprise." 74 A.L.R. 1052.

Cross-examination of this witness upon her statement to the police was so far from being objectionable that the statement itself probably was admissible under the exception to the rule stated by Greenleaf and quoted by this court with approval in the Connor case infra, because it was suggested that Garcia testified as she did by reason of police influence exercised during her incarceration. The statement given before that incarceration was proper evidence in rebuttal of that inference.

■ 4. This objection is based upon the rule laid down by this court in *Connor v. People*, 18 Colo. 373, 33 Pac. 159, to the effect that evidence of what a witness said when not under oath would not be admissible to confirm what he said upon oath. The rule is sound, but the statement here in question does not fall within it for a number of reasons. Dean Wigmore limits its applicability to instances where "the witness has merely testified on direct examination." Wigmore on Evidence (3rd ed.) §1124, p. 194, vol. 4. It may also come within the rule adopted in New Hampshire. *State v. Slocinski*, 89 N.H. 262, 197 Atl. 560. The best reason for its exclusion

from the rule, however, is that it falls within those exceptions laid down in many respectable authorities cited by Wigmore under section 1126, id., that such evidence is admissible to rebut impeachment by proof of inconsistent statements. Direct evidence thereof would not be indispensable. Hints and suggestions of the existence of such inconsistencies might be equally potent. For instance, where the cross-examiner advises the jury of the existence of a written statement and intimates that it is contrary to the testimony given. Applying this rule and reason to Exhibit X, a written statement signed by the people's witness Felix Lopez, what have we? No mention of Exhibit X was made in direct examination. Counsel for defendant called it to the attention of the jury by asking on cross-examination, "Did you go down to the police department and make a statement?" Being answered in the affirmative he, counsel for defendant, addressed the district attorney, asking, "May I have that statement?" Having received it he proceeded, apparently with the statement in hand, to cross-examine the witness from it. Moreover the tenor of his questions implied inconsistency. For instance, "Q. Now did you state to the police that you saw this woman run after the shooting?" We do not here even modify the rule announced in the Connor case. We simply hold that, for the reasons above given, the introduction of Exhibit X does not fall within it. Having dragged the statement before the court and paraded it before the jury, and intimated inconsistency, counsel waived the right to object to its introduction.

(5, 6 and 7). There was no error in the giving or refusal of any instructions, nor in the admission in evidence of the photographs under the circumstances. As to the contention that "the entire atmosphere of the case was distinctly and horribly unfair," we simply answer that it is not borne out by the record.

The judgment is affirmed and it is ordered that it be

executed during the week commencing Monday, December 9, 1940.

MR. CHIEF JUSTICE HILLIARD AND MR. JUSTICE BOCK dissent.

MR. JUSTICE OTTO BOCK dissenting.

I regret the necessity of this dissent. That serious errors were needlessly committed is reflected in the majority opinion. It cannot be too often emphasized that a court is a forum where justice is fairly, calmly and impartially administered according to the rules of evidence and the law. We are dealing in uncertainties when we say that the errors here were not prejudicial. In my opinion, a new trial should be granted.

MR. CHIEF JUSTICE HILLIARD concurs in this dissent.